IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

YAMILET PEREZ,                 )     CASE NO.  1:17-cv-02311
                                   )
             Plaintiff,     )     MAGISTRATE JUDGE
                                   )     KATHLEEN B. BURKE
          v.                )
                                   )
COMMISSIONER OF SOCIAL   )
SECURITY,                  )
                                   )     **MEMORANDUM OPINION & ORDER**
             Defendant.     )

Plaintiff Yamilet Perez ("Plaintiff" or "Perez") seeks judicial review of the final decision

of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties.  Doc. 12.  For the reasons explained herein, the Court finds that the ALJ

failed to adhere to the treating physician rule when assessing and weighing various opinions

rendered by Perez's treating psychiatrist Dr. Vazquez and her treating physician Dr. Osorio.

Thus, the Court **REVERSES and REMANDS** the Commissioner's decision for further

proceedings.

## I.  Procedural History

On February 22, 2012, Perez filed an application for supplemental security income

("SSI").[1]  Tr. 28, 375-380.  Perez alleged a disability onset date of October 18, 2008.  Tr. 28,

375.  She alleged disability due to major depression, PTSD, panic disorder, asthma, and

---

[1] Perez previously filed for SSI on August 13, 2009.  Tr. 27.  That application was denied in an ALJ decision dated August 18, 2011.  Tr. 27, 157-178.  Plaintiff did not seek review of that decision and, as indicated in Plaintiff's brief, Plaintiff did not request reopening of that prior application.  Tr. 27, Doc. 16, p. 1, n. 1.

fibromyalgia.  Tr. 193, 245, 253.  After initial denial by the state agency (Tr. 245-247) and denial

upon reconsideration (Tr. 250-262), Perez requested a hearing (Tr. 264).  On March 27, 2014, a

hearing was held before Administrative Law Judge Eric Westley ("ALJ").  Tr. 112-138.  On May

16, 2014, the ALJ issued an unfavorable decision, (Tr. 217-244), finding that Perez had not been

under a disability within the meaning of the Social Security Act since February 22, 2012, the

date the application was filed (Tr. 224, 238).  Perez requested review of the ALJ's decision by

the Appeals Council.  Tr. 326-328.  On January 4, 2016, the Appeals Council remanded the

matter for evaluation of the impairment of ankylosing spondylitis; further evaluation of opinions

rendered by treating source Dr. Edward D. Vazquez; further evaluation of the opinion rendered

by consultative examiner Dr. Richard C. Halas; and consideration of Perez's ability to speak

English.  Tr. 210-216.

Following the remand, the ALJ conducted a hearing on March 23, 2016.  Tr. 52-79.  On

August 30, 2016, the ALJ issued an unfavorable decision (Tr. 21-51), finding Perez had not been

under a disability within the meaning of the Social Security Act since February 22, 2012, the

date the application was filed (Tr. 28, 43).  Perez requested review of the ALJ's decision.  Tr.

374.  On September 21, 2017, the Appeals Council denied Perez's request for review, making

the ALJ's August 30, 2016, decision the final decision of the Commissioner.  Tr. 1-8.

## II. Evidence

**A.    Personal, vocational and educational evidence**

Perez was born in 1978.  Tr. 60.  She was 38 years old at the time of the 2016 hearing.

Tr. 60.  She completed high school and obtained her GED.  Tr. 60, 119.  Perez attended

vocational training for nursing but did not complete the training.  Tr. 61.  She has three children

who were ages 18, 17 and 14 at the time of the 2016 hearing.  Tr. 61.  Perez has past relevant work as a machine feeder and hand packager.  Tr. 61.

## B.    Medical evidence

### 1.    Treatment history

#### a.   Physical impairments

Perez was diagnosed in 2008 with fibromyalgia.  Tr. 914, 1461.  In 2011, Perez was diagnosed with ankylosing spondylitis.  Tr. 914.  Perez's primary care physician during the relevant period was Leonor M. Osorio, D.O.  *See e.g.*, Tr. 1204-1227, 1229-1242, 1260-1335, 1341-1345, 1450-1460, 1465-1473, 1478-1483, 1499-1512. 1522-1526, 1534-1538, 1546-1603, 1657-1659.

Perez attended physical therapy twice in 2012.  Tr.  1010.  She was discontinued from physical therapy in July 2012 for non-attendance and returned to physical therapy in September 2012.  Tr.  1009-1010.  During the September 2012 physical therapy evaluation, Perez rated her pain as a 7 out of 10.  Tr. 1011.  She complained of chronic cervical and shoulder pain since 2008 as well as bilateral joint pain in her spine and extremities.  Tr. 1013.  Perez was interested in focusing on the problems with her neck and shoulders.  Tr. 1013.  Perez presented with decreased active versus passive cervical and shoulder range of motion, decreased endurance in her shoulder muscles to hold her arms overhead and tingling in her hands, and decreased posterior scapular strength and soft tissue shortening which was believed to be a likely contributor to high pain levels.  Tr. 1013.  Perez reported difficulties with playing sports with her kids, difficulty reaching a plate on a high shelf, and decreased independence with dressing and cleaning her house.  Tr. 1013.  Perez relayed that she found physical therapy helped in the past.  Tr. 1013.  She could not articulate why she was unable to complete her prior physical therapy

and the physical therapist stressed the importance of regular attendance in order to achieve her physical therapy goals. Tr. 1013. At an October 1, 2012, physical therapy visit, Perez reported her pain level to be a 4-5 out of 10. Tr. 1038. She ached all over, noting that she had walked around a flea market for three hours and had done some cleaning. Tr. 1038, 1039. She reported less right neck/upper extremity symptoms than she had during her prior visit and she was continuing to find relief from ultrasound treatments. Tr. 1038. Perez reported some functional limitations. Tr. 1039. She noted that she sometimes limited her driving because of the need to turn her head. Tr. 1039. At the end of October 2012, physical therapy discontinued Perez for lack of attendance. Tr. 1053.

Dr. Bruce D. Long, M.D., a rheumatologist, first saw Perez on April 3, 2013, for her complaints of back and neck pain. Tr. 1168-1173. Dr. Long's impression was "[b]ack pain worse in AM, better PM, stiffness 2 hours in setting of + HLA B27[2] and exam findings of tender SI joints, achilles tendonitis; and plantar fasciitis is supportive of ankylosing spondylitis." Tr. 1171-1172. Dr. Long noted that Perez may also have fibromyalgia. Tr. 1172. Dr. Long started Perez on piroxicam and ordered x-rays of Perez's sacroiliac joints. Tr. 1172.

Perez saw Dr. Long again in June 2013. Tr. 1163-1167. Dr. Long reviewed the SI joint x-rays taken on April 5, 2013, noting that the x-rays were normal; there was no sacroiliitis. Tr. 1158, 1166, 1167, 1346. The piroxicam was not helping so Dr. Long changed Perez's medication to Mobic. Tr. 1163, 1167. In light of the x-rays not showing SI changes, Dr. Long recommended a repeat MRI. Tr. 1167. He noted that Perez may also have fibromyalgia but her fibromyalgia would not explain her type of back pain or enthesopathies. Tr. 1167. Dr. Long

---

[2] "[A] positive HLA-B27 test is associated with the presence of one of a group of diseases called seronegative spondyloarthropathies. This includes diseases such as ankylosing spondylitis (AS)[.]" https://www.webmd.com/osteoarthritis/qa/what-does-the-presence-of-hlab27-mean (last visited 10/29/2018)

advised Perez to see Dr. Osorio for analgesics if needed.  Tr. 1167.  During a subsequent November 2013 visit, Dr. Long noted that Perez had to discontinue Mobic due to a diagnosis of H. Pylori gastritis.  Tr. 1173.  Perez continued to report back pain that was worse in the mornings and two hours of stiffness; she had chest, shoulder and neck pain; and tender iliac crest and feet.  Tr. 1173.  She was HLA B27+.  Tr. 1173.  Dr. Osorio was treating Perez for a rash that she had been having for one month.  Tr. 1174.  Dr. Long's impression was ankylosing spondylitis.  Tr. 1176-1177.  Dr. Long noted that the MRI showed that the SI joints were not normal but the radiologist did not think the MRI was supportive of active sacroiliitis.  Tr. 1177, 1350.  Dr. Long felt however that Perez's condition was clinically active and required treatment.  Tr. 1177.  Dr. Long suggested NSAID's but was not certain that Perez would be able to take them because of her prior diagnosis of H. Pylori.  Tr. 1177.

Perez saw Dr. Long's PA Patricia Paczos in February 2014.  Tr. 1178.  Perez was no longer taking NSAID's.  Tr. 1178.  Perez reported having "too much pain."  Tr. 1178.  She was having pain in her upper and low back, shoulders and neck.  Tr. 1178.  Her feet swelled sometimes.  Tr. 1178.  She used gel in the mornings.  Tr. 1178.  Perez was willing to try Enbrel.  Tr. 1178.  Ms. Paczos' impression was probable ankylosing spondylitis.  Tr. 1181.  Perez was prescribed Enbrel.  Tr. 1181.

When Perez saw Dr. Osorio on March 3, 2014, she complained of hip and back pain.  Tr. 1224.  She had not been taking a muscle relaxant because she did not want to cause problems with her gastritis.  Tr. 1224.  Dr. Osorio informed Perez that she could take Flexeril and it should not cause her problems with gastritis.  Tr. 1225.  Perez thought that Enbrel had not been approved.  Tr. 1224.  Dr. Osorio confirmed that rheumatology had approved it and provided

Perez with documentation to present to the pharmacy so she could begin getting Enbrel injections. Tr. 1224, 1225.

Upon Dr. Osorio's referral, Perez was seen for a physical therapy evaluation on April 2, 2014, for her back pain and fibromyalgia. Tr. 1539. Perez had generalized back pain, decreased trunk range of motion, a slow gait and guarded transfers. Tr. 1541. She reported that she was limited in all activities of daily living and was unable to do anything at home. Tr. 1541. Perez's next session was April 7, 2014. Tr. 1545-1546. During that session, Perez was challenged with all exercises. Tr. 1546. Perez relayed that she had a TENS unit at home and she was encouraged to use it for pain control. Tr. 1546. Perez also saw Dr. Osorio on April 7, 2014. Tr. 1548. Dr. Osorio noted that Perez continued to report chronic pain. Tr. 1548. Perez was continuing to use Enbrel and Perez indicated it was helping with her pain. Tr. 1538. However, Perez reported her pain to be a 7 out of 10. Tr. 1548. Perez was tolerating physical therapy. Tr. 1548. She was not eating as much as she used to. Tr. 1548. At night, Perez was feeling chills from inside but had no fever. Tr. 1548.

In May 2014, Perez saw Dr. Osorio and reported that she was feeling better with the Enbrel injections. Tr. 1282. She had missed an appointment with Dr. Long because she had to attend her grandmother's funeral in Puerto Rico. Tr. 1282. Perez reported migraine headaches that were not severe and were controlled with medication. Tr. 1282. She was forgetting to take her Vitamin D. Tr. 1282. Perez relayed that her fibromyalgia pain was under control. Tr. 1282.

During a July 24, 2014, visit with Dr. Osorio, Perez reported that she was doing much better but she still had good and bad days with her fibromyalgia. Tr. 1559.

Perez saw Dr. Long on August 27, 2014. Tr. 1401-1409. Perez had started taking Enbrel. Tr. 1401. She was feeling better, had more energy, and had less pain. Tr. 1401. She

was using gel in the mornings for 30-60 minutes. Tr. 1401. Perez had no chest pain but complained of pain in her knees (right more than left), thighs, groin and buttocks. Tr. 1401. Dr. Long's impression was probably ankylosing spondylitis. Tr. 1405. Dr. Long continued Perez on Vitamin D and Enbrel and he added etodolac once a day. Tr. 1406.

When Perez saw Dr. Osorio on February 23, 2015, she relayed that her fibromyalgia pain was okay but she still had more bad days than good. Tr. 1572. She complained of right upper quadrant pain, which had started the prior evening. Tr. 1572.

Perez followed up with Dr. Long's PA Ms. Paczos on March 5, 2015. Tr. 1415. Perez was continuing to take Enbrel. Tr. 1415. Perez relayed that Enbrel had been helping at first but it was starting to make her joint pain worse for the prior few months. Tr. 1415. Perez had stopped using Enbrel for three weeks and was feeling better. Tr. 1415. Perez was taking the etodolac which helped at times. Tr. 1415. Ms. Paczos noted that Dr. Osorio's most recent treatment notes reflected that Perez was not taking etodolac because of her GERD. Tr. 1415, 1419. Perez reported that she was having pain everywhere – it was worse in her lower extremities. Tr. 1415. She also had joint swelling in her hands and feet. Tr. 1415. Perez was using gel for about 30 minutes in the morning. Tr. 1415. She was taking Vitamin D when she remembered. Tr. 1415. Rather than switching from Enbrel to another medication, Perez wanted to try taking Enbrel only once every two weeks instead of weekly to see how she managed. Tr. 1419. Ms. Paczos was not certain that Perez was feeling worse because of the Enbrel or something else. Tr. 1419. As long as it did not cause Perez GI problems, Ms. Paczos advised Perez to continue taking etodolac once a day and to follow up in three months. Tr. 1419.

On April 14, 2015, Perez saw Dr. Carlos Romero-Marrero, M.D., in the gastroenterology and hepatology department for a consultation regarding her fatty liver and right upper

quadrant/epigastric abdominal pain. Tr. 1590-1601. Dr. Romero-Marrero recommended medications, modifications to her diet, and exercise. Tr. 1596-1597.

Perez saw Ms. Paczos on June 11, 2015, for follow up regarding her ankylosing spondylitis. Tr. 1426. Perez was only taking Enbrel once a month because she felt that more frequent doses were making her feel worse. Tr. 1426. She reported feeling "ok" that day but noted that her low back always hurt her. Tr. 1426. Her feet and hands swelled some. Tr. 1426. She was using gel in the mornings for 30 minutes. Tr. 1426. Perez was taking etodolac once a day and it helped sometimes. Tr. 1426. She was taking Vitamin D when she remembered. Tr. 1426. Ms. Paczos recommended that Perez continue with Enbrel once a month and etodolac once a day. Tr. 1430.

Perez also saw Dr. Osorio on June 11, 2015. Tr. 1612-1613. Perez's chief complaints were back pain and fibromyalgia pain. Tr. 1612. Perez reported good and bad days but she did not have pain-free days. Tr. 1612. Her depression was "okay." Tr. 1612. Dr. Osorio's physical examination findings were unremarkable. Tr. 1613. Dr. Osorio ordered blood work for unspecified hyperlipidemia and recommended that Perez continue with her medication for her fibromyalgia, back pain and Vitamin D deficiency. Tr. 1613. Dr. Osorio also recommended that Perez continue with exercise as tolerated. Tr. 1613.

Perez saw Dr. Romero-Marrero for follow up on July 28, 2015. Tr. 1621-1626. He noted that Perez was exhibiting a new symptom – tenesmus – for which he recommended a colonoscopy to exclude proctitis and biopsies of the colon and terminal ileum. Tr. 1625.

On October 9, 2015, Perez saw Dr. Osorio with complaints of right arm pain, which she had been having for three weeks. Tr. 1636. Perez had no weakness but relayed mild numbness in her right hand. Tr. 1636. Perez was taking some of her boyfriend's medicine, which was

helping.  Tr. 1636.  Perez also reported epigastric pain when she ate.  Tr. 1636.  On examination, Perez exhibited mild tenderness in her abdomen and diminished range of motion in her right arm secondary to pain.  Tr. 1637.  Dr. Osorio advised Perez against taking other individual's pain medication.  Tr. 1637.  She provided Perez with a prescription for Celebrex and Flexeril for her arm pain.  Tr. 1637.

Upon Dr. Osorio's referral, on November 24, 2015, Perez saw Dr. John H. Rodriquez, M.D., at the Cleveland Clinic Digestive Disease Institute, Department of Surgery for evaluation of her abdominal pain.  Tr. 1645.  Dr. Rodriquez concluded that Perez had symptoms of gallbladder dyskinesia and he discussed removal of her gallbladder.  Tr. 1646.  Perez was interested in proceeding with the surgery.  Tr. 1646.

During a visit with Dr. Romero-Marrero, on January 5, 2016, Perez relayed that her gastrointestinal symptoms had improved.  Tr. 1651.  A colonoscopy that was performed in December 2015 to evaluate Perez's tenesmus showed no evidence of proctitis of inflammation of the colon compatible with inflammatory bowel disease.  Tr. 1651, 1692-1697.  Also, biopsies from terminal ileum and colon were negative.  Tr. 1653.

Perez saw Dr. Osorio on January 27, 2016.  Tr. 1657.  Perez complained of fibromyalgia pain, indicating she had good and bad days.  Tr. 1657.  She was not experiencing depression.  Tr. 1657.  Although she had been grieving the loss of her brother who had been in a nursing home she felt her brother was at peace because he was no longer suffering.  Tr. 1657.  Perez had her gallbladder removed that month and was doing better.  Tr. 1657, 1697-1698.  She was not as hungry but was not having any abdominal pain, diarrhea of constipation.  Tr. 1657.  Dr. Osorio recommended exercise as tolerated for her fibromyalgia.  Tr. 1658.

On April 23, 2015, June 24, 2015, August 4, 2015, October 14, 2015, December 8, 2015, Dr. Osorio signed certifications for home health care for the periods of 3/31/15-5/29/15, 5/30/15-7/28/15, 7/29/15-9/26/15, 9/27/15-11/25/15, 11/26/15-1/24/16.  Tr. 1602, 1619, 1634, 1643, 1728.  Initially Perez received approval during the these periods to have an aide for up to 14 hours per week and then it was revised to 7 hours per week to assist her with activities of daily living,[3] i.e., personal care, light housekeeping, meal preparation and laundry.  Tr. 1882, 1884, 1886, 1888, 1890.  Perez also received nurse visits and occupational and physical therapy during parts of these periods.  Tr. 2024-2060, 2061.  Almost Family provided the in-home services.  Tr. 1879-1180.  The services ended because insurance would no longer provide coverage.  Tr. 1879-1880.

### b.  Mental impairments

On May 16, 2011, Perez saw Dr. Eduardo Vazquez at Children and Family Services for an initial psychiatric evaluation.  Tr. 699-701, 1448-1449.  Perez was seeking treatment for depression.  Tr. 1448.  Dr. Vazquez diagnosed major depression, severe, recurrent; PTSD; panic disorder; and mixed personality disorder.  Tr. 1449.  Perez continued to see Dr. Vazquez as well as counselors/social workers at Children and Family Services through at least January 25, 2016.  Tr. 699-706, 863-867, 943-949, 1187-1203, 1771-1874.  A later diagnosis of schizoaffective disorder was made.  Tr. *See e.g.*, 1850, 1852.  Throughout her mental health treatment sessions, Perez reported symptoms/behaviors including anger, hallucinations, sadness, anxiety, isolating behavior, depression, suicidal ideation, lack of energy, irritability, poor memory and concentration, and suspiciousness.  In December 2012, Perez had attempted suicide by taking pills.  Tr. 954.  She vomited and did not go to the hospital.  Tr. 954.  During a session with Dr.

---

[3] Perez was also approved to receive assistance with administration of her medication but she declined because her boyfriend provided her with assistance in that area.  Tr. 1884, 1886, 1888, 1890.

Vazquez in February 2013, Perez reported she was doing better following her suicide attempt. Tr. 954. Over the course of Perez's treatment, Dr. Vazquez prescribed various medications to treat her mental health symptoms. The intensity of Perez's symptoms varied over the course of her treatment. At times, she was doing better (Tr. 1830, 1858) but at other times she continued to struggle (Tr. 1199, 1201, 1850, 1866).

### 2. Opinion evidence

#### a. Treating physician Dr. Osorio

Dr. Osorio completed a number of reports/medical statements regarding Perez's physical impairments. Dr. Osorio's reports/medical statements included (1) a March 9, 2011, "To whom it may concern" letter (Tr. 527, Exhibit B5F)); (2) a May 3, 2011, Fibromyalgia RFC Questionnaire (Tr. 529-532, Exhibit B6F, pp. 2-5); (3) January 11, 2012, Ohio Job and Family Services form (Tr. 672-673, Exhibit BF14, p. 6); (4) a January 26, 2012, Cuyahoga County Dept. of Job & Family Services Participation Ability Request Form (Tr. 674, Exhibit B14F, p. 7); (5) a March 3, 2014, Medical Source Statement: Patient's Physical Capacity (Tr. 1161-1162, Exhibit B30F);[4] and (6) a February 21, 2016, Medical Source Statement: Patient's Physical Capacity (Tr. 1702-1703, Exhibit BF41, pp. 4-5).

In the March 9, 2011, "To whom it may concern" letter, Dr. Osorio stated that Perez was her patient and "fibromyalgia and depression have worsen. She cannot work due to the severity of pain." Tr. 527.

In the May 3, 2011, Fibromyalgia RFC Questionnaire, Dr. Osorio indicated that she first saw Perez in September 2009 and Perez had appointments with her every three to four months.

---

[4] The ALJ found that the signature on the March 3, 2014, statement found at Exhibit B30F contained an illegible signature and did not include an M.D. or D.O. designation. Tr. 37. In their briefs, both the Plaintiff and Defendant indicate that this form was completed by Dr. Osorio. Doc. 16, pp. 14-15; Doc. 18, p. 7.

Tr. 529. Dr. Osorio indicated that Perez met the American College of Rheumatology criteria for fibromyalgia and she also suffered from depression. Tr. 529. Dr. Osorio stated that Perez's prognosis was fair and her impairments had lasted or were expected to last at least 12 months. Tr. 529. Dr. Osorio explained that fibromyalgia was not diagnosed with laboratory tests but it was clinically diagnosed and confirmed with a rheumatologist. Tr. 529. According to Dr. Osorio, Perez's symptoms included multiple tender points; nonrestorative sleep; chronic fatigue; morning stiffness; frequent, severe headaches; female urethral syndrome; dysmenorrhea; anxiety; panic attacks; and depression. Tr. 529. Dr. Osorio did not feel that Perez was a malingerer. Tr. 530. Dr. Osorio believed that emotional factors contributed to the severity of Perez's symptoms and functional limitations. Tr. 530. Dr. Osorio indicated that Perez had pain bilaterally throughout her body; Perez's pain waxed and waned but she was usually in pain daily; and changes in weather, stress, fatigue and movement/overuse were factors that precipitated pain. Tr. 530. Dr. Osorio opined that Perez's pain or other symptoms were severe enough to interfere frequently (meaning 34-66% of an 8-hour workday) with attention and concentration required to perform even simple work tasks. Tr. 530. Dr. Osorio opined that Perez was incapable of performing even "low stress" jobs. Tr. 530. Dr. Osorio indicated that Perez's medications caused dizziness and drowsiness. Tr. 530. Dr. Osorio offered her opinions regarding Perez's functional limitations in a competitive work setting as follows: Perez could walk about two city blocks without rest or severe pain; Perez could sit at one time for 15 minutes and stand at one time for 15 minutes; Perez could sit for less than 2 hours total in an 8-hour workday and stand/walk for less than 2 hours in an 8-hour workday; Perez would need to walk during an 8-hour workday approximately every 10 minutes for 5 minutes at a time; Perez would need a job that allowed shifting positions at will from sitting, standing and walking; Perez did not require

use of a cane; Perez would not need to elevate her legs with prolonged sitting; and Perez would need to take 3 unscheduled breaks during an 8-hour workday day to sit or lie down for 5 minutes. Tr. 531.

In the January 11, 2012, Job and Family Services form, Dr. Osorio indicated that Perez's medical conditions were depression and fibromyalgia. Tr. 672. Dr. Osorio stated that Perez's health status was "stable with [treatment.]" Tr. 672. Dr. Osorio opined that Perez's standing/walking would be limited to 2 hours in an 8-hour workday and 15 minutes without interruption; Perez's sitting would be limited to 2 hours in an 8-hour workday and 15 minutes without interruption; Perez would be limited to lifting/carrying up to 5 pounds frequently and occasionally; Perez would be moderately limited in her ability to push/pull, bend, reach, handle, and perform repetitive foot movements. Tr. 673. Dr. Osorio explained that the identified limitations were based on Perez's chronic pain, which was caused by her fibromyalgia and depression. Tr. 673.

 A few weeks later, on January 26, 2012, Dr. Osorio completed a Cuyahoga County Dept. of Job & Family Services Participation Ability Request Form. Tr. 674. In that form, Dr. Osorio indicated that Perez could not perform vocational-related tasks, including classroom based training and skills training, due to her uncontrolled pain. Tr. 674.

In the March 3, 2014, Medical Source Statement: Patient's Physical Capacity, Dr. Osorio opined that Perez's chronic pain from her fibromyalgia and ankylosing spondylitis caused functional limitations. Tr. 1161-1162. Dr. Osorio opined that Perez would be limited to lifting/carrying a maximum of 2 pounds occasionally and frequently; she would be limited to standing/walking a total of 3 hours in an 8-hour workday and 15 minutes without interruption; she would be limited to sitting a total of 2 hours in an 8-hour workday and 15 minutes without

interruption; she could rarely climb, balance, stoop, crouch, or crawl; she could occasionally kneel; and she could rarely push/pull; she could occasionally reach and perform fine and gross manipulation.  Tr. 1161-1162.  Dr. Osorio identified no environmental limitations.  Tr. 1162.  Dr. Osorio indicated that Perez had been prescribed a TENS unit and breathing machine.  Tr. 1162.  Dr. Osorio opined that Perez would need to be able to alternate positions between sitting, standing and walking at will.  Tr. 1162.  Dr. Osorio opined that Perez's pain was severe and it would interfere with Perez's concentration, cause her to be off task, and cause absenteeism.  Tr. 1162.  Perez would need to elevate her legs at 45 degrees and she would require more than 5 hours of additional unscheduled rest periods during an 8-hour workday outside of the standard half hour lunch and two, 15 minute breaks.  Tr. 1162.

In the February 21, 2016, Medical Source Statement: Patient's Physical Capacity, Dr. Osorio opined that Perez's chronic pain from her fibromyalgia and ankylosing spondylitis caused functional limitations.  Tr. 1702-1703.  Dr. Osorio opined that Perez would be limited to lifting/carrying a maximum of 22.5 pounds occasionally and 4 pounds frequently; she would be limited to standing/walking for less than 2 hours in an 8-hour workday and 15 minutes without interruption; she would be limited to sitting a total of 2 hours, 49 minutes in an 8-hour workday and 1 hour without interruption; she could rarely crawl; she could occasionally climb, balance, stoop, crouch, and kneel; she could occasionally reach, push/pull, and perform fine and gross manipulation; and she would be limited in her ability to be around heights, moving machinery, temperature extremes, pulmonary irritants, and noise.  Tr. 1702-1703.  Dr. Osorio indicated that Perez had been prescribed a cane, walker and TENS unit.  Tr. 1703.  Dr. Osorio opined that Perez would need to be able to alternate positions between sitting, standing and walking at will.  Tr. 1703.  Dr. Osorio opined that Perez's pain was severe and it would interfere with Perez's

concentration, cause her to be off task, and cause absenteeism.  Tr. 1703.  Perez would need to elevate her legs at 45 degrees and she would require 2 hours of additional unscheduled rest periods during an 8-hour workday outside of the standard half hour lunch and two, 15 minutes breaks.  Tr. 1703.

### b.  Treating psychiatrist Dr. Vazquez

Dr. Vazquez completed a number of reports/medical statements regarding Perez's mental impairments.  Dr. Vazquez's reports/medical statements included (1) an October 14, 2011, Ohio Job and Family Services Mental Functional Capacity Assessment (Tr. 668, Exhibit BF14, p. 1); (2) a January 30, 2012, Cuyahoga County Dept. of Job & Family Services Participation Ability Request Form (Tr. 670, Exhibit BF14, p. 3); (3) an August 29, 2012, Mental Source Statement: Patient's Mental Capacity (Tr. 878-879, Exhibit B22F); (4) a February 14, 2014, Medical Source Statement: Patient's Mental Capacity (Tr. 1159-1160, Exhibit B29F); and (5) a February 10, 2016, Medical Source Statement: Patient's Mental Capacity (Tr. 1437-1438, Exhibit B39F, pp. 1-2).[5]

In the October 14, 2011, Job and Family Services Mental Functional Capacity Assessment check-box style form, Dr. Vazquez opined that Perez was moderately or markedly limited in the areas of understanding and memory, concentration and persistence, social interaction, and adaptation.  Tr. 668.  Dr. Vazquez indicated that Perez was unemployable and the functional limitations identified were expected to last for 12 or more months.  Tr. 668.

In the January 30, 2012, Cuyahoga County Dept. of Job & Family Services Participation Ability Request Form, Dr. Vazquez indicated that Perez would be unable to perform vocational-related tasks, including classroom based training and skills training, because Perez's depression

---

[5] Dr. Vazquez's February 10, 2016, statement is also located at Exhibit B44F (Tr. 1769-1770).

and difficulty sleeping resulted in poor energy, difficulty concentrating, and panic attacks that caused her to avoid being around people.  Tr. 670.

In the August 29, 2012, Mental Source Statement: Patient's Mental Capacity check-box style form, Dr. Vazquez rated Perez's functional ability in the areas of making occupational adjustment, intellectual functioning and making personal and social adjustment.  Tr. 878-879. Dr. Vazquez rated Perez's ability as "good"[6] in one area – maintain appearance.  Tr. 879.  In all other areas, Dr. Vazquez rated Perez's ability as "fair" or "poor."[7]  Tr. 879.  In the comment section, Dr. Vazquez provided the following statement in support of his functional assessment – "Has been depressed with panic attacks, having hallucinations and persecutory delusions and her response to medication and counseling has been minimal.  I have seen her since 5-16-11."  Tr. 879.

In the February 14, 2014, Medical Source Statement: Patient's Mental Capacity check-box style form, Dr. Vazquez rated Perez's functional ability in the areas of making occupational adjustments, intellectual functioning, and making personal and social adjustments.[8]  Tr. 1159-1160.  Dr. Vazquez rated Perez's ability to maintain appearance as "constant."  Tr. 1160.  Dr. Vazquez rated Perez's ability to follow work rules; deal with the public; and interact with supervisors as "frequent."  Tr. 1159.  Dr. Vazquez rated Perez's ability to use judgment; respond appropriately to changes in routine settings; relate to co-workers; function independently without

---

[6] The form defined "good" as "[a]bility to function in this area is satisfactory."  Tr. 878.

[7] The form defined "fair" as "[a]bilty to function in this area is moderately limited but not precluded.  May need special consideration and attention.  Tr. 878.  "Poor" is defined as "[a]bility to function is significantly limited."  Tr. 878.

[8] The rating choices were (1) "constant," meaning "ability to perform activity is unlimited[;]" (2) "frequent," meaning " ability for activity exists for up to 2/3 of a work day[;]" (3) "occasional," meaning "ability for activity exists for up to 1/3 of a work day[;]" and (4) "rare," meaning "activity cannot be performed for any appreciable time[.]"  Tr. 1159.

redirection; work in coordination with or proximity to others without being distracted; work in coordination with or in proximity to others without being distracting; understand, remember and carry out simple job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations; management of funds/schedules; and ability to leave home on own as "occasional." Tr. 1159-1160. Dr. Vazquez rated Perez's ability in the areas of maintain attention and concentration for extended periods of 2 hour segments; maintain regular attendance and be punctual within customary tolerances; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a constant pace without an unreasonable number and length of rest periods; understand, remember and carry out complex job instructions; and understand, remember and carry out detailed, but not complex job instructions as "rare." Tr. 1160. When asked to identify the diagnosis and symptoms that supported the assessment, Dr. Vazquez indicated "schizoaffective disorder, frequent mood changes, and suspicious." Tr. 1160.

In the February 10, 2016, Medical Source Statement: Patient's Mental Capacity check-box style form, Dr. Vazquez rated Perez's functional ability in the areas of making occupational adjustments, intellectual functioning, and making personal and social adjustments.[9] Tr. 1437-1438. Dr. Vazquez rated Perez's ability to relate to co-workers; interact with supervisors; maintain appearance; socialize; and leave home on her own as "frequent." Tr. 1437-1438. Dr. Vazquez rated Perez's ability to follow work rules; use judgment; respond appropriately to changes in routine settings; deal with the public; function independently without redirection; work in coordination with or proximity to others without being distracted; work in coordination with or in proximity to others without being distracting; understand, remember and carry out

_____
[9] *See* FN 8 regarding the rating choices.

simple job instructions; behave in an emotionally stable manner; relate predictably in social

situations; and management of funds/schedules as "occasional." Tr. 1437-1438. Dr. Vazquez

rated Perez's ability to maintain attention and concentration for extended periods of 2 hour

segments; maintain regular attendance and be punctual within customary tolerances; deal with

work stress; complete a normal workday and workweek without interruption from

psychologically based symptoms and perform at a constant pace without an unreasonable

number and length of rest periods; understand, remember and carry out complex job instructions;

and understand, remember and carry out detailed, but not complex job instructions as "rare." Tr.

1437-1438. When asked to identify the diagnosis and symptoms that supported the assessment,

Dr. Vazquez indicated that Perez had schizoaffective disorder that was treated over time with

different medications but her improvement had been limited and had not lasted; Perez had

episodes of depression during which Perez would stop taking care of herself and her home and

become dependent on family to take of her; and Perez had episodes of suspiciousness, irritability,

and hallucinations that interfered with her ability to communicate and recognize reality. Tr.

1438.

### c. Consultative examining physician Dr. Sioson

On July 7, 2010, consultative examining physician Eulogio Sioson, M.D., CIME,

conducted a consultative evaluation. Tr. 519-520. Following his evaluation, Dr. Sioson

concluded that (1) Perez suffered from neck/back/joint pains; she had numbness in her hands and

feet of unclear etiology; and she had 14 bilateral tender points; (2) Perez had asthma, moderate,

persistent by history; and (3) Perez suffered from depression but she was not emotionally labile

and was able to maintain attention and concentration. Tr. 520. Dr. Sioson opined that, "if one

considers limitation of range of motion from pain and [his] findings, work-related activities would be limited to light or sedentary work." Tr. 520.

### d. Consultative examining psychologist Mr. Halas

On January 13, 2010, consultative examining psychologist Richard C. Halas, M.A., conducted a consultative evaluation. Tr. 515-518. Mr. Halas diagnosed generalized anxiety disorder with some phobic features and occasional panic attacks and major depression, recurrent type. Tr. 518. Mr. Halas provided his opinion regarding Perez's work-related mental abilities. Tr. 518. Mr. Halas opined that Perez's ability to understand, remember, and follow instructions and/or directions and her ability to maintain attention and concentration to perform simple, repetitive tasks were intact and not impaired. Tr. 518. Mr. Halas opined that Perez's ability to relate to others, including fellow workers and supervisors was markedly impaired, noting that Perez's symptoms of depression and anxiety were likely to restrict her ability in this area. Tr. 518. Mr. Halas opined that Perez's ability to withstand the stresses and pressures associated with day-to-day work activities was markedly impaired, noting that Perez's adjustment levels would likely quickly deteriorate under the pressures of a normal work setting. Tr. 518.

### e. State agency reviewing physicians/psychologists

*Mental impairments*

On May 14, 2012, state agency reviewing psychologist Robelyn Marlow, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 184-185) and Mental RFC Assessment (187). In the PRT, Dr. Marlow found mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation, each of an extended duration. Tr. 194. In the Mental RFC Assessment, Dr. Marlow opined that Perez was limited to simple,

routine, and repetitive tasks in an environment with no more than occasional and superficial interaction with the public or coworkers. Tr. 187. Dr. Marlow's mental RFC was an adoption of the mental RFC from the ALJ decision dated August 18, 2011.[10] Tr. 187.

Upon reconsideration, on February 26, 2013, state agency reviewing psychologist Aracelis Rivera, Psy.D., completed a review and affirmed Dr. Marlow's conclusions. Tr. 202-203, 205-206. In rendering his opinion, Dr. Aracelis considered Perez's allegations of worsening mental health symptoms. Tr. 205-206.

*Physical impairments*

On May 14, 2012, state agency reviewing physician Ermias Seleshi, M.D., completed a Physical RFC Assessment. Tr. 186-187. Dr. Seleshi adopted the physical RFC from the ALJ decision dated August 18, 2011, finding that Perez could stand/walk for 6 hours in an 8-hour workday or sit for 6 hours in an 8-hour workday with the ability to change positions at will; lift 10 pounds; never climb ladders or scaffolds; and have no concentrated exposure to extreme heat, extreme cold, humidity, fumes, dust or environmental pollutants. Tr. 186.

Upon reconsideration, on January 9, 2013, state agency reviewing physician Jeffrey Vasiloff, M.D., affirmed Dr. Seleshi's conclusions. Tr. 205.

## C. Testimonial evidence

### 1. Plaintiff's testimony

Perez was represented and testified at the March 23, 2016, hearing, with the assistance of an interpreter.[11] Tr. 60-73. When asked to explain why she felt she was disabled, Perez stated

---

[10] As indicated above, Perez's 2009 application resulted in a denial of benefits at the ALJ level in an August 18, 2011, decision. Tr. 27, 157-158. Perez did not seek further review of that August 18, 2011, decision. Tr. 27, Doc. 16, p. 1, n. 1.

[11] Perez also was represented and testified at the March 27, 2014, hearing. Tr. 118-128.

that, even with medication, she had too much pain and also she did not feel well. Tr. 61-62. She had thoughts about committing suicide in December when her brother died. Tr. 62. Perez's pain was the worst in her neck, shoulders and back. Tr. 63. She was prescribed injectable medication for her pain but did not feel that it helped much. Tr. 63.

Perez estimated being able to stand for about an hour before her feet and hip start to hurt and she has to sit down for about a half an hour before she can stand back up. Tr. 63-64. Perez's pain is worse with walking than standing – the pain comes sooner and she gets very tired quickly. Tr. 64. Perez estimated being able to sit down for about two hours and then she has to get up or lie down. Tr. 64. She can lift less than 20 pounds. Tr. 64. Lifting overhead is a problem for Perez. Tr. 65. Depending on the height of the table, reaching out in front could be a problem for Perez. Tr. 65. Also, repetitive reaching would be problematic for Perez. Tr. 70. She sometimes has a problem gripping and holding on to things. Tr. 65. Dr. Osorio has advised Perez to elevate her legs and Perez uses heating pads and a TENS unit. Tr. 70.

Perez indicated that learning how to do a job could be a problem for her because she has problems remembering things. Tr. 65-66. She understands a little English but would need instructions explained in Spanish. Tr. 66. Perez felt she could have problems getting along with people at a job. Tr. 66-67. She gets panic attacks and is concerned that people will harm her, which is why she does not leave the house often. Tr. 67. Perez hears voices and sees shadows. Tr. 67. The more stress she has going on in her life, the more she has hallucinations. Tr. 67. She has panic attacks about once a month. Tr. 68.

Since April 2015, Perez had a home health aide coming in to her home to assist her with personal and household tasks, e.g., cleaning, cooking, bathing, eating, and getting out of bed when Perez is unable to get herself out of bed. Tr. 69. Perez estimated being unable to get out of

bed about three days every two weeks.  Tr. 69.  The home health aide was prescribed by Dr.

Osorio.  Tr. 69.

### 2.    Vocational Expert

Vocational Expert ("VE") Deborah Lee testified at the March 23, 2016, hearing.  Tr. 70-

77.  The VE described Perez's past work as a machine feeder and hand packager as medium,

unskilled jobs.  Tr. 72-73.  When asked to consider a hypothetical individual having an RFC

consistent with Perez's RFC as ultimately found by the ALJ, the VE indicated that the described

individual could not perform Perez's past work but there would be other jobs available, including

final assembler, table worker, and bonder, semiconductor.  Tr. 73-75

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy[12] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[12] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his August 30, 2016, decision, the ALJ made the following findings:[14]

---

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

[14] The ALJ's findings are summarized.

1.      Perez has not engaged in substantial gainful activity since February 22, 2012, the application date.  Tr. 30.

2.      Perez has the following severe impairments: fibromyalgia, affective disorders, anxiety disorders, personality disorders, and ankylosing spondylitis.  Tr. 30-31.

3.      Perez does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 31-33.

4.      Perez had the RFC to perform sedentary work as defined in 20 C.F.R. 416.967(a) except that Perez should be precluded from climbing ladders, ropes, or scaffolds; should be precluded from concentrated exposure to extreme heat, extreme cold, humidity, and fumes, odors, dusts, gases, and poor ventilation; with the ability to perform simple, routine, and repetitive tasks in a setting where the tasks are demonstrated or are explained in Spanish; with the ability to occasionally interact with coworkers and the public if that interaction is limited to speaking and signaling as it is defined in the SCO.  Tr. 33-42.

5.      Perez is unable to perform any past relevant work.  Tr. 42.

6.      Perez was born in 1978 and was 34 years old, which is defined as a younger individual age 18-44, on the date the application was filed.  Tr. 42.

7.      Perez is not able to communicate in English and is considered in the same way as an individual who is illiterate in English.  Tr. 42.

8.      Transferability of job skills is not an issue because Perez's past relevant work is unskilled. Tr. 42.

9.      Considering Perez's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Perez can perform, including final assembler, table worker, and bonder semi-conductor.  Tr. 41-42.

Based on the foregoing, the ALJ determined Perez had not been under a disability, as defined in the Social Security Act, since February 22, 2012, the date the application was filed. Tr. 43.

## V. Plaintiff's Arguments

First, Perez argues that the ALJ erred when considering and weighing the opinions rendered by Drs. Vazquez and Osorio.  Second, Perez argues that the ALJ erred by failing to properly assess her credibility.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ failed to properly consider the treating source opinion evidence**

Perez argues that the ALJ failed to properly weigh the opinions of treating sources Drs. Vazquez and Osorio and failed to consider all the opinions rendered by Dr. Osorio.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544). Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

Having reviewed the ALJ's decision and record before the Court, the Court finds that the ALJ's weighing and consideration of the treating source opinion evidence falls short of satisfying the requirements of the treating physician rule.

### *Dr. Vazquez*

The ALJ's reasons for providing less than controlling weight to the multiple opinions rendered by Dr. Vazquez between 2011 and 2016 were conclusory and/or are not supported by the record. The ALJ discounted most of Dr. Vazquez's opinions on the basis that he found that the extreme limitations assessed by Dr. Vazquez were inconsistent with Perez's activities of daily living, inconsistent with Dr. Vazquez's own evaluations of Perez, and inconsistent with the record. Tr. 36.

The ALJ repeatedly relied upon Perez's activities of daily living to discount Dr. Vazquez's opinions, including Dr. Vazquez's February 2016 opinion. Tr. 36. Relying on Perez's activities of daily living is problematic, especially with respect to the 2016 opinion, because, it overlooks the fact that, beginning in April 2015 and continuing through January 2016,

Perez received assistance with her activities of daily living through a home health care agency. Tr. 34, 1602, 1619, 1634, 1643, 1728.   The need for these services was certified by Dr. Osorio. Tr. 1602, 1619, 1634, 1643, 1728.  Initially Perez received approval to have an aide for up to 14 hours per week, which was revised to 7 hours per week, to assist her with activities of daily living,[15] i.e., personal care, light housekeeping, meal preparation and laundry.  Tr. 1882, 1884, 1886, 1888, 1890.   These services ended in January 2016 because insurance would no longer provide coverage.  Tr. 1879-1880.   The ALJ acknowledged evidence regarding the home health care services.  Tr. 34 (discussing Perez's testimony that she had a home health aide since April 2015 who "washes clothes, cleans the house, changes the bed, and bathes her[]"); Tr. 41 (recognizing Perez received assistance from a home health aide).  However, the ALJ failed to explain how this evidence was considered or factored in, if at all, when concluding that Perez's activities of daily living were a reason for discounting functional limitations assessed by a longtime treating source.  The ALJ also cited Perez's ability to care for her children as evidence that was inconsistent with functional limitations identified by Dr. Vazquez.  Tr. 36.  However, the ALJ noted in his decision evidence that that Perez's children and boyfriend helped <u>her</u> with chores around the house.  Tr. 32; *see also* Tr. 40.  Having relied on Perez's activities of daily living and ability to take care of her children as reasons to discount her treating source's opinions, the ALJ should have more clearly explained how the ALJ considered and factored in evidence documenting that Perez required and received assistance from others, including outside home health aides, in her activities of daily living.  Instead, without sufficient explanation, the ALJ found that Perez was "an individual clearly capable of independent activities of daily living[.]"  Tr. 41.

---

[15] Perez was also approved to receive assistance with administration of her medication but she declined because her boyfriend provided her with assistance in that area.  Tr. 1884, 1886, 1888, 1890.

Also, the ALJ discounted Dr. Vazquez's August 29, 2012, opinion on the basis that it was inconsistent with his own evaluation of Perez (Tr. 36) but the ALJ does not identify what evaluation(s) he found the opinion to be inconsistent with or how the unidentified evaluation was inconsistent.   Thus, the Court is left to speculate.   Assuming arguendo that the ALJ was referring to Dr. Vazquez's initial evaluation from May 2011, that evaluation was more than a year old at the time of the completion of the August 2012 evaluation.   Further, treatment notes in closer proximity to the completion of the August 29, 2012, opinion reflect different or increased symptoms.   For example, a March 14, 2012, treatment note reflects that Perez was suspicious and felt that someone was following her and she was hearing voices.   Tr. 706.   In August 22, 2012, Perez was not in a good place and was having more anxiety and panic.   Tr. 943.

The ALJ also generally discounted Dr. Vazquez's opinions on the basis that they were inconsistent with the record as a whole.   However, the ALJ failed to clearly explain how Dr. Vazquez's limitations were inconsistent with the record as a whole.   Mr. Halas, the consultative examining psychologist, found marked impairments in Perez's ability to relate to others and withstand the pressures associated with day-to-day work activities.   Tr. 518.   The ALJ weighed Mr. Halas' opinion but that analysis provides this Court with no greater ability to fully assess whether the ALJ's weighing of Dr. Vazquez's opinions is supported by substantial evidence. The ALJ simply stated that he assigned little weight to the marked limitations in Mr. Halas' opinion because they were not consistent with the record as a whole and accepted the less restrictive portions of Dr. Halas' opinion, only saying that those portions of the opinion supported the ALJ's RFC.   Tr. 37.   This analysis, like the ALJ's analysis of Dr. Vazquez's opinions, is vague and conclusory.

The ALJ's analysis of Dr. Vazquez's February 2014 opinion also falls short. The ALJ concluded that the 2014 opinion included functional restrictions in the areas of using judgment and following work rules that were less restrictive than those included in Dr. Vazquez's August 2012 opinion and, therefore was inconsistent with the earlier 2012 opinion. Tr. 36. The ALJ apparently relied on this inconsistency as a basis to provide no weight to most of the opinion except he assigned great weight to those portions of the opinion that showed a greater ability to function in 2014 than in 2012. Tr. 36. The ALJ may not pick and choose portions of opinions that support his findings without providing a clear analysis of why certain portions are rejected while other are accepted. Considering that the opinions were rendered almost two years apart, without further explanation, the Court is unable to conduct a meaningful analysis of the weighing of the 2014 opinion.

For the reasons discussed above, the ALJ's consideration and weighing of Dr. Vazquez's opinions fall short of satisfying the treating physician rule.

### *Dr. Osorio*

In addition to the deficiencies noted above with respect to the weighing of Dr. Vazquez's opinions, the ALJ erred in weighing the opinions of Dr. Osorio.

The ALJ discussed and weighed Dr. Osorio's May 3, 2011, opinion and her March 3, 2014, opinion. With respect to the March 3, 2014, opinion, the ALJ failed to attribute the opinion to Dr. Osorio, finding that the signature was illegible. Tr. 37. The Commissioner in her brief recognizes, however, that the opinion was rendered by Dr. Osorio (Doc. 18, p. 16 (citing Tr. 1161-1162, Exhibit B30F)). The ALJ assigned little weight to these opinion, stating that they were not consistent with the record as a whole. Tr. 37, 38. The ALJ also stated that Perez's

activities of daily living did not support the extreme limitations contained in the May 2011 opinion.  Tr. 38.

Even assuming arguendo that the ALJ's conclusory statements were sufficient to satisfy the requirements of the treating physician rule, reversal and remand is warranted because the ALJ completely failed to discuss or weigh other opinions rendered by Dr. Osorio.  The ALJ does not mention Dr. Osorio's January 11, 2012, Ohio Job & Family Services form, which set forth diagnoses and functional limitations, or Dr. Osorio's February 21, 2016, medical source statement.[16]  The ALJ should have considered all of Dr. Osorio's opinions and the failure to do so was error.

The Commissioner contends that the Court should find that the ALJ's failure to discuss all the opinions rendered by Dr. Osorio is harmless.  The Commissioner argues that the ALJ's reasons for discounting Dr. Osorio's opinions that he did discuss are no less applicable to the opinions that the ALJ did not address and/or that there are inconsistencies among Dr. Osorio's various opinions that warrant less than controlling weight being assigned to the opinions that the ALJ did not address.  To reach this result, the Commissioner engages in and proposes that this Court engage in post hoc rationalization.  Considering the complete failure of the ALJ to address opinion evidence rendered by a longtime treating physician, the Court will not engage in speculation or post hoc rationalization.  Further, the Court does not find that the ALJ's error was harmless.  Dr. Osorio herself certified the need for home health care services beginning in early 2015 through January 2016,[17] yet the ALJ failed to consider Dr. Osorio's February 21, 2016, opinion, which was rendered following the need for these home health care services.  In addition

---

[16] There are other statements/letters in the record from Dr. Osorio that the ALJ did not discuss.  Tr. 527, 674. Plaintiff does not focus on these statements when challenging the ALJ's decision with respect to Dr. Osorio.

[17] The home health care services ended due to the expiration of insurance coverage.  Tr. 1879-1880.

to failing to consider this and other opinions rendered by Dr. Osorio, as discussed above, the ALJ failed to explain how Perez's need for home health care services to assist her with activities of daily living squared with his repeated reliance on Perez's activities of daily living to discount functional limitations contained in treating source opinions.

For the reasons discussed above, the ALJ's consideration and weighing of Dr. Osorio's opinions fall short of satisfying the treating physician rule.

### C. Other issue

Perez also argues that the ALJ failed to properly assess her credibility. Since further analysis of the treating source opinions may impact the credibility assessment, the Court declines to address this alternate argument.

## VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.


Dated: October 30, 2018

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge